1

2

3

4

5

6

7

8

9

10

**O**

# United States District Court
# Central District of California

11

12

13

14

15

16

PRIESTLEY FAUCETT,

　　　　　Plaintiff,

　　v.

MOVE, INC. d/b/a REALTOR.COM,

　　　　　Defendant.

Case № 2:22-cv-04948-ODW (ASx)

**ORDER DENYING PLAINTIFF'S
RENEWED MOTION FOR CLASS
CERTIFICATION [114]**

17

## I.　　　INTRODUCTION

18

19

20

21

22

23

24

25

26

27

28

　　　Plaintiff Priestley Faucett brings this putative class action against Defendant Move, Inc. d/b/a Realtor.com ("Move"), asserting claims under the Telephone Consumer Protection Act ("TCPA").　(First Am. Compl. ("FAC") ¶ 2, Dkt. No. 18.) Faucett now moves for class certification pursuant to Federal Rules of Civil Procedure ("Rule" or "Rules") 23(b)(2), and 23(b)(3).　(Renewed Mot. Class Certification ("Mot." or "Motion"), Dkt. Nos. 114 (unsealed), 115 (sealed).)　For the reasons discussed below, the Court **DENIES** Faucett's Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.　Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II.      BACKGROUND[2]

This putative class action concerns Move's allegedly TCPA-proscribed telemarketing calls to prospective real estate investors.  (*See generally* FAC.)  Move is a real estate listing company that runs numerous websites.  (Opp'n 3, Dkt. Nos. 123 (unsealed), 145 (sealed).)  One of those websites includes Realtor.com, an online platform for buyers, sellers, and renters to post and search for real estate listings.  (FAC ¶ 3.)    Move also provides several services, including a service called ReadyConnect.  (Opp'n 3.)  Through ReadyConnect, Move obtains and purchases contact information, or "leads," from either its own websites or from third-party websites.  (*Id.*; Mot. 4.)   Move has purchased leads from at least 500 unique third-party websites.  (Decl. Daniel Treiber ISO Opp'n ("Treiber Decl.") Ex. N ("Nations Info Websites"), Dkt. No. 123-9 (lodged).)

### A.      The Websites

In 2022, Faucett visited three third-party websites: (1) MyHouseDeals.com ("MyHouseDeals"), owned by non-party REI Network; (2) HUDHomesUSA.org ("HUDHomes"), owned by non-party Nations Info Corp.[3]; and (3) Propertyshark.com ("Propertyshark"), owned by non-party Yardi (together, the "Websites").  (Opp'n 4–9.)

To gather leads, each of the Websites gives users such as Faucett the option to register for membership or request additional information.   For example, MyHouseDeals takes users to this webpage to "activate" their account:

---

[2] Faucett submits almost no evidence in support of his Motion.  Although Faucett references sealed exhibits he previously filed in support of his original Motion for Class Certification, (Mot. 3 n.2), those exhibits were improperly filed and not part of the current record.  Faucett also attached exhibits to a declaration in support of his application to file under seal, (Appl. Seal, Dkt. No. 55), but after the Court granted leave to file under seal, (Order Seal, Dkt. No. 61), Faucett did not re-file his exhibits with reference to the Motion, *see* C.D. Cal. L.R. 79-5.2.2(c) ("Once the Court has granted leave to file a document under seal, the Filing Party [here, Faucett] must thereafter file the document with whatever motion . . . the under-seal filing is intended to support.").  Faucett's failure to file any usable evidence is an independent ground to deny his Motion.  *See Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) ("[P]laintiffs bear the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence.").

[3] Nations Info is also known as RealtyStore.  (Treiber Decl. ¶ 29, Dkt. No. 123-9.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14



(Decl. Vlad Vidaeff ISO Opp'n ("Vidaeff Decl.") Ex. E, Dkt. No. 123-5.)    To
complete the activation process, users must check a box next to the statement, "I agree
to the Terms of Service & Privacy Policy."    (*Id.*)    The phrase "Privacy Policy"
contains a hyperlink to MyHouseDeals's privacy policy.  (Vidaeff Decl. ¶ 5, Dkt.
No. 123-5.)  MyHouseDeals's privacy policy contains the following language:

> By providing your phone number and email address, you are agreeing to
> receive text messages, emails, and/or calls (even if you are previously
> subscribed to the do not call list) from MyHouseDeals and our network
> of partners and affiliates (lenders or related professional services) and
> their network of service providers.  These calls might be recorded; and
> may be direct, auto-dialed, or use pre-recorded/artificial voices.  This
> consent is not a requirement or condition to purchase.

(Decl. Robin McGrath ISO Opp'n ("McGrath Decl.") Ex. H ("MyHouseDeals Privacy
Policy"), Dkt. No. 123-3.)

1    Similarly, HUDHomes, another Website that provides leads to Move, also

2    offers users an option to register for membership.  (Opp'n 6–7.)  However, instead of

3    placing consent language in a hyperlinked privacy policy, HUDHomes places the

4    language directly below the button that a consumer must click to register:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19



20

21    (Decl. Ryan Fell ISO Mot. Compel ("Fell Decl.") Ex. A ("HUDHomes Registration"),

22    Dkt. No. 51-3.)

23    Finally, Propertyshark, the third Website Faucett visited that also generates

24    leads for Move, prompts users to provide their contact information if they wish to

25    learn  more  about  a  specific  property.    (Opp'n 7–8.)    Similar  to  HUDHomes,

26    Propertyshark provides consent language directly underneath the button that users

27    must press to provide their contact information:

28

(Decl. Lauren E. Sparks ISO Opp'n ("Sparks Decl.") ¶ 5, Dkt. No. 123-7.)   This consent language also contains a link to a Privacy Policy that defines "real estate professionals" to include Realtor.com or Move.  (*Id.* ¶ 8; *id.* Ex. A ("Propertyshark Privacy Policy"), Dkt. No. 123-7.)

Faucett provided his contact information to the Websites; he used three different email addresses and two different names.  (Treiber Decl. ¶ 4.)  The Websites delivered Faucett's information to Move as three separate "leads" because Faucett provided different names and email addresses.  (*Id.*)

**B.    Move's Contacts with Faucett**

On April 26, 2022, Move first contacted Faucett in response to his inquiry on MyHouseDeals.  (Treiber Decl. ¶ 6; McGrath Decl. ¶ 11, Dkt. No. 123-3.)  During the

1    conversation, Move's agent asked Faucett if he was "still interested" in connecting

2    with "an investor-friendly agent."   (McGrath Decl. Ex. J ("Apr. 26 Call Tr."), Dkt.

3    No. 123-3 (lodged).)   Faucett replied, "yes," before ending the call abruptly because

4    he was "smoking some weed." (*Id.*)   Move made several other attempts to follow up

5    on this lead before eventually discontinuing its attempts.  (Treiber Decl. ¶¶ 7–10.)

6        On April 30, 2022, Move contacted Faucett in response to his inquiry on

7    Propertyshark.  (*Id.* ¶ 14.)   Faucett answered Move's second attempt to reach him and

8    confirmed that he had placed an inquiry about a property in Louisiana.   (*Id.* ¶ 15;

9    McGrath Decl. Ex. K ("Apr. 30 Call Tr."), Dkt. No. 123-3 (lodged).)    After a

10   protracted discussion, Move connected Faucett with a real estate agent.  (Apr. 30 Call

11   Tr.)  The real estate agent later provided Faucett with an in-person tour of the property.

12   (Opp'n 9; McGrath Decl. Ex. O ("Faucett Photos"), Dkt. No. 123-3.)   Faucett would

13   later testify that he was "stringing [the real estate agent] along" and "giving her a BS

14   story to keep her around because she is very hot."   (McGrath Decl. Ex. F ("Faucett

15   Dep. Tr.") 86:15–16, 87:3–7, Dkt. No. 123-3.)

16       Also on April 30, 2022, Move contacted Faucett in response to his inquiry on

17   HUDHomes.  (Treiber Decl. ¶ 19.)   Faucett did not respond, and Move attempted to

18   contact Faucett again on May 10, 2022.   (*Id.* ¶¶ 19–20.)   This time Faucett did

19   respond, except that he immediately replied: "This is not a good time to call me. I'm

20   at a funeral. If you can call me back tomorrow around 12, that would be great."

21   (McGrath Decl. Ex. L ("May 10 Call Tr."), Dkt. No. 123-3 (lodged).)   Move's agent

22   confirmed that Move would call Faucett back "tomorrow at that time," to which

23   Faucett replied: "Thank you so much."  (*Id.*)

24       Faucett claims that he made a "clear opt-out request" on or about May 4, 2022.

25   (FAC ¶¶ 24–26.)   Faucett also claims that Move sent prerecorded voice messages on

26   five more occasions.    (*Id.* ¶ 26.)    Faucett does not provide any affidavit or

27   documentary evidence to support this, but Move provides evidence that on June 4,

28   2022, Move called Faucett twice to follow up on Faucett's HUDHomes lead.  (Treiber

Decl. 21.)  On the second call, Faucett picked up and immediately said, "[p]lease stop calling me."  (McGrath Decl. Ex. P. ("June 4 Call Tr."), Dkt. No. 123-3 (lodged).)

**C.**    **Procedural Background**

On July 20, 2022, Faucett filed this putative class action against Move. (Compl., Dkt. No. 1.)  Faucett alleges four causes of action under the TCPA.  (FAC ¶¶ 53–84.)  Faucett now moves to certify one Class and one Subclass (together, the "Classes"):

> **Prerecorded Voice Class**: All persons within the United States who, (1) between September 12, 2018, and an Order granting class certification, (2) received a call or voicemail using an artificial or prerecorded voice, (3) from Defendant or anyone acting on Defendant's behalf, (4) to said person's cellular telephone number, (5) without emergency purpose, and (5) without their prior express written consent to receive prerecorded calls from Defendant, (6) where Defendant obtained such person's telephone number from REI Network, RealtyStore, or Yardi.

> **National DNC Subclass**: All members of the Prerecorded Voice Class who, between September 12, 2018, and an Order granting class certification, (1) received two or more calls or voicemails (2) within any 12-month period (3) by or on behalf of Defendant; (4) for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services; (4) where the person's telephone number had been listed on the National Do Not Call Registry [("NDNCR")] for at least thirty days.

(Mot. 8.)  The Motion is fully briefed.  (*See* Opp'n.)[4]

## III.    LEGAL STANDARD

A cause of action may proceed as a class action if a plaintiff meets the threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of

---

[4] Faucett set the hearing date on his Motion for August 4, 2025.  (Mot.)  Thus, his reply brief was due July 21, 2025.  *See* C.D. Cal. L.R. 7-10.  Not only did Faucett file his reply brief three days late, (Reply, Dkt. No. 130 (filed July 25, 2025)), Faucett also filed an amended reply brief, a week late, without seeking leave of the Court or noting the differences between the original and the amended brief, (Am. Reply, Dkt. No. 132 (filed July 28, 2025)).  Thus, the Court declines to consider either untimely reply brief.  *See* C.D. Cal. L.R. 7-12 ("The Court may decline to consider any memorandum or other document not filed within the deadline set by order or local rule.").

representation.  Fed. R. Civ. P. 23(a); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–64 (9th Cir. 2022).  In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  "[T]he failure [to meet] any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (noting that plaintiff bears burden to affirmatively satisfy each element of the Rule 23 analysis).

Faucett seeks parallel certification under Rule 23(b)(2) and 23(b)(3).  (Mot. 8.) Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) applies where a court finds "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"Rule 23 does not impose a mere pleading standard; plaintiffs cannot plead their way to class certification through just allegations and assertions." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024) (citing *Dukes*, 564 U.S. at 350, 359).  Instead, "plaintiffs must affirmatively demonstrate by a preponderance of actual evidence that they satisfy all of the Rule 23 prerequisites." *Id.* (citation modified).

Consequently, a district court must perform a "rigorous analysis" to ensure that the plaintiff has satisfied each of Rule 23's prerequisites.  *Dukes*, 564 U.S. at 351; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011).  In many cases, "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.  The district court may consider the merits only to the extent that they overlap with the requirements of Rule 23 and "not to

1  determine whether class members could actually prevail on the merits of their claims."

2  *Ellis*, 657 F.3d at 983 n.8; *see Dukes*, 564 U.S. at 350–52.   When resolving factual

3  disputes, even in the context of a motion for class certification, district courts must

4  consider "the persuasiveness of the evidence presented."  *Ellis*, 657 F.3d at 982.

5  <center>**IV.     DISCUSSION**</center>

6  Faucett moves to certify his TCPA claims under Rules 23(b)(2) and 23(b)(3).

7  (Mot. 8.)   Under the TCPA, it is unlawful to make a call using a prerecorded voice

8  without the prior express consent, or prior express written consent, of the called party.

9  47 U.S.C. § 227(b)(1)(B) (requiring prior express consent where a call to a residential

10  telephone line uses a prerecorded voice); *see also* 47 C.F.R. § 64.1200(a)(2) (requiring

11  prior express written consent where a call using a prerecorded voice "introduces an

12  advertisement or constitutes telemarketing").

13  Prior express consent is consent where the consumer has "clearly stated that the

14  telemarketer may call" and "clearly expressed an understanding" that the call would

15  be related to the purchase or investment in property.  *In re Rules & Reguls.*

16  *Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1833 (2012).

17  It is a less exacting standard than prior express *written* consent, where the consumer

18  must have "received 'clear and conspicuous disclosure' of the consequences of

19  providing the requested consent."  *Id.* at 1843.   Under the former, the focus is "upon

20  the facts of [the] situation [in which the person gave consent]."  *Fober v. Mgmt. &*

21  *Tech. Consultants, LLC*, 886 F.3d 789, 793 (9th Cir. 2018) (alteration in original)

22  (citing *In re Rules*, 27 FCC Rcd. at 1843–44).  In contrast, under the latter, the focus is

23  on the consent language itself.  *See* 47 C.F.R. § 62.1200(f)(9) (defining prior express

24  written consent as "an agreement, in writing, bearing the signature of the person called

25  that clearly authorizes" communication.").

26  Move argues that Faucett fails to satisfy Rules 23(b)(2), 23(b)(3), and three of

27  the   four   threshold   requirements   of   Rule 23(a)—commonality,   typicality,   and

28  adequacy.  (Opp'n 11–23.)

<center>9</center>

1    **A.    Commonality (Rule 23(a)(2)) and Predominance (Rule 23(b)(3))**

2          The first issue is whether Faucett establishes that the proposed Classes satisfy

3    Rule 23(a)(2)'s commonality requirement and Rule 23(b)(3)'s predominance

4    requirement.  Commonality is required for class certification and is only satisfied if

5    "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

6    The commonality requirement has "been construed permissively, and all questions of

7    fact and law need not be common to satisfy the rule."  *Ellis*, 657 F.3d at 981 (citation

8    modified).  However, "it is insufficient to merely allege any common question."  *Id*.

9    "What matters to class certification . . . is not the raising of common 'questions'—

10   even in droves—but rather, the capacity of a class-wide proceeding to generate

11   common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350

12   (alteration in original).

13         The predominance inquiry tests whether the proposed Classes are "sufficiently

14   cohesive to warrant adjudication by representation" and focuses on the relationship

15   between individual and common issues.  *Senne v. Kan. City Baseball Corp.*, 934 F.3d

16   918, 927 (9th Cir. 2019).  Although the commonality inquiry overlaps with

17   Rule 23(b)(3)'s predominance inquiry, *see In re AutoZone*, 289 F.R.D. 526, 533 n.10

18   (N.D. Cal. 2012), meeting the commonality requirement is insufficient to satisfy

19   predominance, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998),

20   *overruled on other grounds by Dukes*, 564 U.S. at 338.  Rule 23(b)(3) "'presumes that

21   the existence of common issues of fact or law have been established pursuant to

22   Rule 23(a)(2),' and focuses on whether the 'common questions present a significant

23   aspect of the case and they can be resolved for all members of the class in a single

24   adjudication.'"  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir.

25   2019) (quoting *Hanlon*, 150 F.3d at 1022).  If so, "there is clear justification for

26   handling the dispute on a representative rather than on an individual basis."  *Id.*  In

27   contrast, an individual question can defeat predominance and derail class certification

28

where class members must present evidence that varies from member to member. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S 442, 453 (2016).

Faucett argues that he has satisfied commonality and predominance here because common proof will prove his and the proposed Classes' claims. (Mot. 9–15.) While the question of consent here is a common one and satisfies the permissive commonality requirement, the Court finds that Faucett fails to satisfy predominance because determining adequacy of consent under the TCPA will require individualized inquiries that will predominate this litigation. *See Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 628–29 (S.D. Cal. 2015) (citation modified) ("[F]or purposes of [TCPA] class certification, the party seeking certification must prove that consent, or the lack thereof, can be resolved on evidence and theories applicable to the entire class.").

Specifically, the definition of the proposed Class cover too many websites, and each website will require an individualized inquiry to determine whether a class member consented, even under the more exacting prior express written consent standard. For example, the three Websites that Faucett accessed—MyHouseDeals, HUDHomes, and Propertyshark—are materially different for purposes of a consent inquiry. While MyHouseDeals's consent language does not specify which companies may contact the consumer, (Viadeff Decl. ¶ 5), HUDHomes and Propertyshark specifically named companies that could contact the consumer, (HUDHomes Registration; Propertyshark Privacy Policy). And even between HUDHomes and Propertyshark, the Websites identify the approved companies in different locations: HUDHomes identifies several companies directly in the registration pop-up, (HUDHomes Registration), while Propertyshark identifies Move in a hyperlinked privacy policy, (Propertyshark Privacy Policy).

These three examples highlight the disparities in only the three Websites that Faucett visited. Move also shows that at least one of the lead providers from which it obtains customer information—Nations Info, also known as RealtyStore—operates hundreds of other websites that use varied language and techniques to obtain consent.

(Nations Info Websites; Treiber Decl. Ex. L ("Nations Info Registrations"), Dkt. No. 123-9 (lodged).) Move sufficiently establishes that these additional websites are subsumed in Faucett's proposed class definition, meaning that at least 500 websites, and their various consent forms, are potentially at issue here. (*See* Nations Info Websites; Nations Info Registrations; Opp'n 18–19, 22–23.)

The many variations in the disparate consent forms implicated by Faucett's proposed class definitions do not lend themselves to class-wide adjudication. The Court would be forced to hold "mini-trials" to decide whether each consent form adequately conferred consent. *See Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 558 (C.D. Cal. 2012) (denying class certification where the court would "have to hold 'mini-trials' to determine" whether there was adequate consent). Specifically, the factfinder will have to go through each of potentially 500 websites to determine whether each clearly and conspicuously disclosed the consequences of providing consent under whichever standard governs here. *In re Rules*, 27 FCC Rcd. at 1843; *see Trenz v. On-Line Adm'rs, Inc.*, No. 2:15-cv-08356-JLS (KSx), 2020 WL 5823565, at *7–8 (C.D. Cal. Aug. 10, 2020) (finding "lack of predominance" because defendants demonstrated that there were a "wide range of forms" and the "terms of the documents varied both among dealerships and over time"). This is not conducive to a class action.

Faucett argues that individualized inquiries will not predominate because Move's consents "all fail to satisfy the TCPA" as they fail to seek consent from consumers to specifically receive either prerecorded calls or calls from Move. (Mot. 11–12.) This argument is unpersuasive for two reasons.

First, it ignores the law. Examining the prior express consent standard, the Ninth Circuit has expressly found that "it does not matter" that the caller was not the one identified in the plaintiff's consent. *Fober*, 886 F.3d at 793–94 ("True, Plaintiff could not have known the identity of the specific entity that would ultimately call her. But when Plaintiff authorized Health Net to disclose her phone number for certain

purposes, she necessarily authorized someone other than Health Net to make calls for those purposes." (emphasis omitted)).  And there is nothing in the Ninth Circuit's reasoning, nor in the FCC's regulations, that would preclude applying this logic to the prior express written consent standard as well.  Thus, the question of whether the consents at issue in this action specifically identify Move is not legally significant.

Second, Faucett's argument is unpersuasive because it ignores the evidence. Two of the three Websites that Faucett visited—MyHouseDeals and Propertyshark— contains language indicating that the consumer agrees to receive prerecorded calls, specifically.  (MyHouseDeals Privacy Policy; Propertyshark Privacy Policy.)  While the third Website, HUDHomes, did not have specific "prerecorded" calls language, Faucett provides no evidence that HUDHomes used prerecorded voices to contact consumers.  Thus, Faucett's argument that the consents are all legally defective, such that the Court need not individually inquire into each consent, is unpersuasive.

Accordingly, the Court finds that, although Faucett may satisfy Rule 23(a)(2)'s commonality requirement, he does not satisfy Rule 23(b)(3)'s predominance requirement, thus precluding class certification under Rule 23(b)(3).[5]

**B.     Typicality (Rule 23(a)(3)) and Adequacy (Rule 23(a)(4))**

Move also argues that Faucett is neither a typical nor an adequate representative for the Classes, precluding class certification altogether.

To satisfy typicality, a representative party must have claims or defenses that are "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The test of typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "Several courts have held

---

[5] Faucett filed several notices of supplemental authority regarding commonality and predominance. (Dkt. Nos. 147, 152, 153.)  In response, Move filed a request for leave to file a response to Faucett's first notice of supplemental authority.  (Dkt. No. 150.)  Given the above disposition, Move's request is **DENIED AS MOOT**.  (Dkt. No. 150.)

1   that 'class certification is inappropriate where a putative class representative is subject

2   to unique defenses which threaten to become the focus of the litigation.'"   *Id.*

3   (collecting cases).

4        To satisfy adequacy, the representative party must demonstrate that he "will

5   fairly and adequately protect the interests of the class."   Fed. R. Civ. P. 23(a)(4).

6   There are two inquiries to determine adequacy of representation.   First, courts ask if

7   the representative plaintiff and their counsel "have any conflicts of interest with other

8   class members."   *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).   Second,

9   courts ask if the "representative plaintiffs and their counsel [will] prosecute the action

10  vigorously on behalf of the class."   *Id.*

11       Move argues Faucett is atypical of the proposed Classes he seeks to represent

12  and will inadequately represent them.   (Opp'n 20.)   Specifically, Move argues that it

13  has a consent defense unique to Faucett and that his "serious credibility issues" stand

14  to preoccupy the litigation.   (*Id.*)

15       *1.    Consent*

16       The Court finds that Faucett "is subject to unique defenses which threaten to

17  become the focus of the litigation," *Hanon*, 976 F.2d at 508, specifically, that he

18  invited the calls at issue.   "The typical member of the class [Faucett] seeks to

19  represent [would] hope[] and expect[] that his privacy would be respected and not

20  invaded by unwanted phone calls from [Move]."   *Wiley v. Am. Fin. Network, Inc.*,

21  No. 8:22-cv-00244-CJC (DFMx), 2023 WL 4681538, at *3 (C.D. Cal. July 3, 2023)

22  (citation modified) (quoting *Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375,

23  382 (C.D. Cal. 2016)).   However, there is ample evidence in the record that Faucett

24  does not fit this mold.   For example, during the April 26, 2022 call, Faucett confirmed

25  that he had submitted an inquiry on MyHouseDeals looking to be "connect[ed] with

26  an investor-friendly agent."   (Apr. 26 Call Tr.)   Moreover, during the May 10, 2022

27  call, allegedly after Faucett had opted out, Faucett asked a Move caller to "call [him]

28  back tomorrow around 12."   (May 10 Call Tr.)   When the Move caller asked whether

1  the caller should "call [Faucett] back tomorrow," Faucett seemingly confirmed, saying

2  "Thank you so much."  (*Id.*)

3       This evidence tends to prove two things detrimental to other proposed Class

4  members.  First, it tends to prove that Faucett wanted to be contacted, and "a

5  representative party is not typical of class members if he consented to the challenged

6  activity."  *Lightbourne v. Printroom Inc.*, 307 F.R.D. 593, 604 (C.D. Cal. 2015).

7  Second, the evidence tends to prove that when Faucett submitted the online

8  registration forms, he expected to receive calls from "investor-friendly agents,"

9  specifically.  (Apr. 26 Call Tr.)  This expectation is relevant because Federal

10  Communications Commission ("FCC") "orders and rulings show that the transactional

11  context matters in determining scope of a consumer's consent to contact." *Van Patten*

12  *v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1046 (9th Cir. 2017).  Thus, Faucett

13  acknowledging that he was expecting the very call he received tends to help Move

14  prove that the "prior express consent' exception [applies]."  *Fober*, 886 F.3d at 793

15  ("[A] call must relate to the reason why the called party provided his or her phone

16  number in the first place." (citing *Van Patten*, 847 F.3d at 1046)).  Either way,

17  Faucett's unique consent issues will require his counsel "to devote most of their time

18  and resources trying to refute [Move's] contentions regarding [Faucett's] consent,"

19  and in doing so, skew the focus of the litigation, to the proposed Class's detriment.

20  *Sapan v. Veritas Funding, LLC*, No. 8:23-cv-00468-CJC (ADSx), 2023 WL 6370223,

21  at *5 (C.D. Cal. July 28, 2023) (denying class certification in part because of evidence

22  that plaintiff "play[ed] along" with the defendant's calls and may have indicated

23  consent).

24       Accordingly, the Court finds that Faucett is subject to unique consent defenses

25  and thus fails to satisfy the typicality requirement.  While Move's consent defense

26  alone renders Faucett atypical, the Court finds Move's credibility argument worth

27  discussing.

28

1        *2.    Credibility*

2        The Court finds that Faucett's credibility presents an additional issue unique to

3  Faucett that is likely to preoccupy the litigation.  Courts have found that credibility

4  destroys typicality in "unique situations where it is predictable that a major focus of

5  the litigation will be on" the named plaintiff's credibility.  *DZ Reserve v. Meta*

6  *Platforms, Inc.*, 96 F.4th 1223, 1239 (9th Cir. 2024).  Such unique situations include

7  where "a named plaintiff in a securities action was a serial litigant who purchased

8  stock solely to facilitate litigation," or "where the named plaintiff insisted that he was

9  not really deceived by the alleged misrepresentation." *Id.*

10       Faucett's credibility issues rise to the level of such a "unique situation where it

11 is predictable that [they will be] a major focus of the litigation." *Id.*  Specifically,

12 evidence supports that Faucett filled out online forms for ulterior motives and is an

13 untruthful witness.  For example, although Faucett previously told Move that he had

14 an interest in flipping houses, (Apr. 30 Call Tr.), he later testified that he not only

15 made up his interest in real estate investing, but also did not know what flipping

16 houses even meant:

17    Q.    What does "ready to flip" mean?
18    A.    I have no clue.
      Q.    You don't know what it means?
19    A.    No.
20    Q.    It doesn't mean flipping houses?
21    A.    I'm not sure what that meant at that time.  I just know it was giving
              [the real estate agent] a BS story to keep her around because she is
22            very hot.  They call her the Deals in Heels.  And I don't get talked
23            to by pretty women like that."

24 (Faucett Dep. Tr. 86:22–87:7.)

25       Moreover, Faucett's deposition testimony is rife with further examples of him

26 crudely testifying about interactions with the real estate agent:

27

28

> Q.     Do you recall [the real estate agent] showing you a foreclosure home in Denham Springs, Louisiana, within days after realtor.com introduced you to [the real estate agent]?
>
> A.     I don't remember if it was a foreclosure home.  I don't remember if we looked at property at all.  I just remember we met up and she had no underwear on.  Because she sat down.  That's the only thing I remember.

(*Id.* 94:6–14.)

Finally, Faucett's deposition testimony paints him as a forgetful, if not recalcitrant, witness:

> Q.     Did you ever visit a website called hudhomeusa.org?
> A.     I don't recall.
> Q.     Are you denying that you did it?
> A.     I don't remember.
> Q.     Did you ever visit a website called propertyshark.com?
> A.     I don't even remember.  I've never heard of them.
> Q.     Do you deny doing that?
> A.     I don't remember . . .
> Q.     Did you ever visit a website called myhousedeals.com?
> A.     I don't remember.

(*Id.* 29:2–21.)

This evidence casts serious doubt on Faucett's ability to adequately represent the proposed Classes and provides a strong factual basis for the Court to infer that Move will seek to attack Faucett's credibility.  *See Nghiem*, 318 F.R.D. at 383 n.4 ("It does not matter whether Defendants will ultimately prevail on these defenses. What matters is that Defendants will assert these defenses, and they have a factual basis for doing so.").  At the very least, this evidence will "confuse the jury or create a risk that the jury would develop unfair doubt over the class's claims."  *Sapan*, 2023 WL 6370223 at *5.  Worse yet for the proposed Classes, if the factfinder disbelieves Faucett, they may credit Move's evidence regarding consent over Faucett's evidence

1    as lead Plaintiff.    *See Fober*, 886 F.3d at 793 (citing *In re Rules*, 27 FCC Rcd.

2    at 1843–44).

3         For these reasons, the Court finds that Faucett cannot adequately represent the

4    Classes' interests because he is subject to unique defenses and credibility issues that

5    stand to preoccupy the litigation. *CE Design Ltd. v. King Architectural Metals, Inc.*,

6    637 F.3d 721, 726 (7th Cir. 2011) ("A named plaintiff who has serious credibility

7    problems or who is likely to devote too much attention to rebutting an individual

8    defense may not be an adequate class representative."). The Court also finds that

9    Faucett is not a typical member of the class he seeks to represent because of his

10    unique consent issues. Accordingly, Faucett fails to satisfy the adequacy or typicality

11    requirements.

12    **C.    Rule 23(b)(2)**

13         As Faucett does not satisfy Rule 23(a)'s requirements, class certification fails

14    under any Rule 23(b) prong. However, even if Faucett had satisfied Rule 23(a),

15    certification under Rule 23(b)(2) is still improper because Faucett lacks standing to

16    seek injunctive relief.

17         Rule 23(b)(2) provides for class certification if "the party opposing the class has

18    acted or refused to act on grounds that apply generally to the class, so that final

19    injunctive relief or corresponding declaratory relief is appropriate respecting the class

20    as a whole." However, "[a]s a threshold matter, the court must determine whether the

21    named plaintiff[] [has] standing to seek an injunction." *In re ConAgra Foods*, 90 F.

22    Supp. 3d 919, 977 (9th Cir. 2015). Thus, to demonstrate standing for the purposes of

23    Rule 23(b)(2), plaintiffs "must proffer evidence that there is 'a sufficient likelihood

24    that [they] will be wronged'" again. *Id.* (emphasis omitted) (alteration in original)

25    (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

26         Here, Faucett does not demonstrate a "likelihood of substantial and immediate

27    irreparable injury" that would justify equitable relief. *O'Shea v. Littleton*, 414 U.S.

28    488, 502 (1974). Moreover, Move also proffers evidence that there is no likelihood

that Move will contact Faucett again, or any other potential class members on the permanent NDNCR.  (*See* McGrath Decl. Ex. E ("Walker Dep Tr.") 262:17–22, Dkt. Nos. 123-3 (unsealed), 145-2 (sealed).)  Thus, the Court finds that Faucett fails to show that he has standing to seek an injunction.  Consequently, certification under Rule 23(b)(2) is improper for this additional reason.

## V.    CONCLUSION

For the reasons discussed above, the Court finds that Faucett does not meet Rule 23(a)'s prerequisites of commonality, adequacy, and typicality.  Moreover, Faucett also fails to meet the standards prescribed under Rules 23(b)(2) or 23(b)(3).  Therefore, the Court **DENIES** Faucett's Renewed Motion for Class Certification. (Dkt. No. 114.)

**IT IS SO ORDERED.**

December 23, 2025

_____

**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**

19